IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

PATRICIA S. BRINEY                                                                 PLAINTIFF

               v.                  Civil No. 07-2079

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                            DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Patricia Briney, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claims for period of disability, disability insurance benefits (DIB), and supplemental security income ("SSI") pursuant to Titles II and XIV of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 416(i) and 423. In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## Procedural Background

The plaintiff filed her applications for DIB and SSI on May 9, 2005, alleging an onset date of December 1, 2004, due to social anxiety, bipolar/manic depressive disorder, and chronic headaches. (Tr. 88). An administrative hearing was held on August 30, 2006. (Tr. 261-282). Plaintiff was present and represented by counsel.

At the time of the administrative hearing, plaintiff was 23 years old and possessed an eleventh grade education. (Tr. 20). The record reveals that she had past relevant work experience ("PRW") as a grocery bagger, cashier, cook, and factory worker. (Tr. 19, 89, 98, 263, 269).

On September 28, 2006, the Administrative Law Judge ("ALJ") determined that plaintiff suffered from a combination of severe impairments, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 14-21). The ALJ found that plaintiff maintained the RFC to perform work at all exertional levels with some non-exertional limitations. (Tr. 17). Mentally, he determined that plaintiff could perform work where the interpersonal contact is incidental to the work performed and where the complexity of the tasks is learned and performed by rote with few variables, requires little judgment, and requires simple, direct, and concrete supervision. With the assistance of a vocational expert, the ALJ determined that plaintiff could perform work as a production line assembler and deboner in poultry production. (Tr. 20).

The plaintiff appealed this decision to the Appeals Council, but her request for review was denied on May 30, 2007. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 9, 10).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists

in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Evidence Presented:**

On December 1, 2004, Dr. Robert Noonan, plaintiff's treating doctor, saw her for a routine prenatal appointment. (Tr. 202-204). Plaintiff returned on December 6, 2004, with complaints of left sided chest pain, sharp in character, that radiated straight through the left shoulder blade. (Tr. 200-202). Plaintiff stated that the pain had been constant since Thursday and had been persistent, not positional. (Tr. 201). An examination revealed a regular rate and rhythm, clear and symmetric breath sounds, and no tenderness in the chest. A chest x-ray was also negative, as was a venous doppler. (Tr. 200). Dr. Noonan assessed plaintiff with chest pain, possibly musculoskeletal in nature. (Tr. 201).

Plaintiff returned to Dr. Noonan on December 9, 2004. (Tr. 199-200). Dr. Noonan reiterated his diagnosis of atypical, persistent chest pain. (Tr. 200).

On December 13, 2004, plaintiff presented with complaints of headaches, blurry vision, double vision, and concerns about elevated blood pressure. (Tr. 240). Dr. Noonan noted her obesity, and diagnosed her with elevated blood pressure and mild pregnancy induced hypertension without proteinuria or other signs of pre-eclampsia. He then discharged her home. (Tr. 240).

In a report dated December 21, 2004, plaintiff presented with persistent nausea and vomiting, and severe headache. (Tr. 197-199, 229). Dr. Noonan diagnosed plaintiff with abdominal pain with leukocytosis of unclear etiology. Plaintiff had reported experiencing some hematochezia, and Dr. Noonan indicated that she could be suffering from coilitis. Her

hypertension also appeared to be resolved, although she did have some proteinuria. (Tr. 229-230).

On January 14, 2005, plaintiff presented with elevated blood pressure. (Tr. 186-188). Dr. Noonan diagnosed plaintiff with pregnancy induced hypertension, but noted that this condition was stable. He then outlined the signs and symptoms of pre-eclampsia. (Tr. 234). The baby was delivered via c-section on January 18, 2005.

In a progress note dated March 23, 2005, plaintiff returned for postnatal care. (Tr. 175-178). Her weight was 317 pounds. (Tr. 175). Dr. Noonan discussed postpartum depression with plaintiff, and reminded her that it was normal to feel blue and a little let down after all the excitement of pregnancy and delivery. (Tr. 178). He then prescribed Flagyl and Ortho Tri-Cyclen. (Tr. 178).

On April 7, 2005, plaintiff sought treatment for an extremely heavy menstrual flow, cramping, and clotting. (Tr. 174-175). Dr. Noonan stated that plaintiff was obese, but was otherwise well appearing. He diagnosed her with metrorrhagia and prescribed Provera, Doxycycline, and Darvocet to treat plaintiff's intrauterine bleeding. (Tr. 174).

Dr. Noonan saw plaintiff on April 26, 2005, for complaints of depression, difficulty sleeping, loss of energy, loss of appetite, loss of interest in usual activities, and suicidal ideation. (Tr. 172). Dr. Noonan noted that plaintiff had expressed suicidal ideations with a history of bipolar disorder characterized by marked mood swings with mood elevation for days without sleep followed by periods of marked depression. (Tr. 172). It was also noted that plaintiff had a family history of depression. (Tr. 172). Dr. Noonan diagnosed plaintiff with bipolar disorder and prescribed Lithium. (Tr. 173).

5

In a progress note dated May 19, 2005, Dr. Noonan reported that plaintiff's weight remained at 317 pounds. (Tr. 171). Although she had been prescribed Lithium to treat her bipolar disorder, plaintiff indicated that she had stopped taking it after 1 week because it was making her "mean." She did not believe that she could take this medication and still care for her baby. (Tr. 171). Records indicate that she appeared anxious. Dr. Noonan assessed plaintiff with bipolar disorder and replaced the lithium with a prescription for Effexor. (Tr. 171, 172).

Dr. Noonan saw plaintiff for a follow-up of her depression on June 21, 2005. (Tr. 169-170). Her weight was 313 pounds. (Tr. 169). Dr. Noonan noted that the Effexor was effectively treating her moodiness, but was not helping with her anxiety. (Tr. 170). She continued to experience headaches, anxiety, and difficulty sleeping. (Tr. 170). Dr. Noonan added that she was "having difficulty with staying up all night for 1-2 days at a time, then getting very depressed and down." (Tr. 170). He again diagnosed her with bipolar disorder, and added Depakote to plaintiff's medications. (Tr. 170).

Dr. Kathleen M. Kralik, a psychologist, evaluated plaintiff on June 27, 2005. (Tr. 127-133). Plaintiff reported problems with her attention and concentration, difficulty being around others, panic attacks, manic episodes, and severe headaches. Dr. Kralik noted that plaintiff's stream of thought seemed logical and goal-directed; she had a tendency toward impulsive responses which sometimes negatively impacted the quality and cohesiveness of her responses; and, was in touch with reality. Her immediate memory was fair, short-term memory was generally good, and long-term memory was adequate. Plaintiff also had poor insight relative to her peers, poor impulse control, very limited/immature coping skills, and poor frustration tolerance. The doctor noted that plaintiff showed intermittently impaired attention and

6

concentration. (Tr. 130). Dr. Kralik diagnosed plaintiff with mild to moderate ADHD; anxiety disorder; socially avoidant/social phobia; alleged panic symptoms; mood disorder not otherwise specified, rule out postpartum hormonal causes and sleep deprivation-induced; alleged bipolar II symptoms, and, personality disorder not otherwise specified with avoidant, dependent, and obsessive-compulsive features. (Tr. 132-133). She concluded that the birth of plaintiff's child and her desire to stay home with her baby (given her fearful nature and anxious attachment issues) were her primary motivation not to work. Dr. Karlik noted evidence of exaggeration, but opined that it seemed more part of plaintiff's dramatic, fearful style and her difficulties putting things in perspective, rather than a deliberate attempt to deceive or defraud. Without treatment, Dr. Karlik indicated that plaintiff's condition was not expected to improve significantly. However, with treatment, she stated that plaintiff could be expected to improve quickly and significantly. (Tr. 133).

On August 8, 2005, plaintiff was treated by Dr. Noonan. (Tr. 168-169). Records indicate that plaintiff had not been taking her anti-depressants faithfully because she could not afford the medication. Dr. Noonan advised plaintiff of the different pharmachologic methods of dealing with depression, including regular exercise and a balanced diet. She also recommended that plaintiff have regular contact with at least one person in her immediate family. (Tr. 169).

On December 5, 2005, plaintiff was diagnosed with panic attacks and depression. (Tr. 165-166). Plaintiff was directed to continue the Zoloft and prescribed Vistaril. (Tr. 166). Records also indicate that Depakote was prescribed on December 9, 2005. (Tr. 165).

7

On March 7, 2006, plaintiff indicated that she was not getting "much rest." (Tr. 163-164). No changes were noted in her physical exam. Plaintiff was diagnosed with anxiety and depression, and told to continue taking the Zoloft and Vistaril. (Tr. 164).

Plaintiff was also seen by Dr. Dave Thomason of Counseling Associates, Inc. on November 22, 2006, well after the ALJ rendered his decision. (Tr. 249-258). Dr. Thomason diagnosed plaintiff with bipolar I, panic disorder with agoraphobia, personality disorder not otherwise specified, and problems related to her social environment. (Tr. 249). He also assessed her with a GAF of 44. He concluded that plaintiff was affected by anger, aggression, anxiety, panic, phobias, mood swings, depressed mood, and withdrawal on a daily basis. (Tr. 253). It was noted that plaintiff was taking Abilify and Effexor, and obtaining those prescriptions through a patient assistance program. Dr. Thomason prescribed Xanax and opined that further psychiatric evaluation of plaintiff was needed. (Tr. 258).

**Discussion**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all of the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that

[a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

At the onset, we note that plaintiff's only alleged physical impairment is chronic headaches. However, contrary to plaintiff's contention, the record does not show that plaintiff sought consistent treatment for her alleged headaches. (Tr. 170, 197-199, 240). *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). In fact, the record does not even reflect that plaintiff was ever diagnosed with a headache related impairment such as migraine headaches, tension headaches, or any other diagnosis that would suggest that plaintiff's headaches were severe enough to interfere with her ability to perform activities of daily living. Likewise, there is no evidence to suggest that plaintiff has been consistently prescribed strong pain medications to treat her headaches. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain); *Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (infrequent use of prescription drugs supports discrediting complaints). As such, when considering the record as a whole, we find that the ALJ's failure to specifically mention and discuss this impairment was harmless error.

9

Although there is some evidence in the record to show that plaintiff was obese, we can find no evidence to indicate that plaintiff's obesity prevented her from performing work-related activities. None of her treating doctors suggested her weight imposed any additional work-related limitations, and she did not testify that her weight imposed additional restrictions. *See Anderson v. Barnhart,* 344 F.3d 809, 814 (8th Cir. 2003). Accordingly, we do not find the ALJ's failure to discuss plaintiff's obesity to be fatal. *See Forte v. Barnhart*, 377 F.3d 892, 896-897 (8th Cir. 2004).

The evidence does make clear that plaintiff has been diagnosed with bipolar disorder and has suffered from symptoms related to this disorder since, at least, the birth of her daughter in 2005. We note, however, that plaintiff has reported some improvement in her condition since her treating doctor prescribed medications, particularly with regard to the depression. (Tr. 170, 277). *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). Further, aside from one evaluation conducted by Dr. Kralik, plaintiff did not seek treatment from a mental health professional prior to the administrative hearing, and has never been hospitalized due to her mental impairments. In fact, Dr. Kralik even concluded that the birth of plaintiff's child and her desire to stay home with her baby (given her fearful nature and anxious attachment issues) were her primary motivation not to work. Simply put, there is nothing in the record, aside from plaintiff's testimony, to show that her mental impairments prevented her from performing all work-related activity.

Plaintiff contends that the ALJ erred because he concluded that her only severe impairment was affective mood disorder. (Tr. 16). We note that the term mood disorder is used

10

to described "mental health disorders in which emotional disturbances consist of prolonged periods of excessive sadness (depression) or excessive joyousness or elation (mania)." *See Depression and Mania*, *at* www.merck.com. Episodes of a single depressive or manic disturbance can recur, resulting in unipolar disorder, or the episodes can alternate between depressive episodes and mania, resulting in bipolar disorder. *Id*. Accordingly, it is clear that the term affective mood disorder encompasses the diagnosis of bipolar disorder or manic-depressive disorder.

Plaintiff also argues that the ALJ failed to properly consider all of her impairments in combination. Specifically, she refers to diagnoses of depression, anxiety, mood swings, and personality disorder. We note, however, that bipolar I disorder is defined as "a mood disorder characterized by one or more manic episodes, possibly alternating with major depressive episodes." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM) IV-TR 345 (4th ed. 2000). A review of the DSM reveals that one of the symptoms of a depressive episode associated with bipolar disorder is "increased irritability (e.g., persistent anger, a tendency to respond to events with angry outbursts or blaming others, or an exaggerated sense of frustration over minor matters.)," very similar to the definition of major depression. *Id*. at 349, 369. The symptoms of mania also include irritability and speech "marked by complaints, hostile comments, or angry tirades." *Id*. at 358. Another common symptom associated with a manic episode is a lasting period of behavior that is different from the person's usual behavior, which also bears a striking resemblance to the definition of mixed personality disorder (or personality disorder not otherwise specified, as it is referred to in the DSM). *Id*. at 358, 685. As such, it

11

seems clear that all of the diagnoses listed by plaintiff were properly taken into consideration in her diagnosis of bipolar I disorder.

Plaintiff contends that her failure to seek more consistent treatment and failure to seek treatment from a mental health professional should be excused due to her lack of finances. However, plaintiff testified that her treating doctor had her on a payment plan, which allowed her to see him as needed. (Tr. 272). As such, it is clear that plaintiff is aware that low-cost and indigent medical programs are available. There is, however, no evidence to suggest that plaintiff ever sought low-cost or indigent mental healthcare, prior to the issuance of the ALJ's opinion. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir.1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations") (internal quotations omitted). Accordingly, we do not believe that plaintiff's lack of finances excuses her failure to seek more consistent physical and mental treatment.

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability. On her supplemental interview outline, plaintiff reported the ability to care for her personal hygiene, prepare simple meals, clean the house, vacuum, sweep, clean the bathroom, ride in a car, shop for groceries and household needs, pay bills, count change, use money orders, visit her mother, care for her infant daughter while her husband works, and watch TV. (Tr. 63-70). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child,

occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Plaintiff also reported a desire to go to back to school and continue her education, which she believed she could do with mental health treatment. (Tr. 271). Clearly, this level of activity is inconsistent with a finding of disability.

Therefore, although it is clear that plaintiff suffers from some degree of pain and discomfort, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform all physical activity subject to limitations on performing work where the interpersonal contact is incidental to work performed, the complexity of tasks is learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and

13

concrete. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, plaintiff's subjective complaints, and her medical records. Dr. Kathryn M. Gale, a non-examining, consultative doctor, completed a mental RFC assessment and a psychiatric review technique form on July 7, 2005. (Tr. 134-138). Dr. Gale opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; and, set realistic goals or make plans independently of others. (Tr. 134,

135). However, Dr. Gale concluded that plaintiff was able to perform work where the "interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete." (Tr. 136). Dr. Gale opined that plaintiff experienced mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. 149).

Dr. Steve Owens performed a physical RFC assessment on November 21, 2005. (Tr. 153-161). Dr. Owens opined that plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; and, sit for about 6 hours in an 8-hour workday. (Tr. 154). He also concluded that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 155-157). We note, however, that none of plaintiff's treating doctors ever placed any work-related limitations, exertional or nonexertional, on plaintiff. *See Baldwin v. Barnhart*, 349 F.3d 549, 557 (2003) (holding that a lack of physician imposed restrictions weighs against a plaintiff's claim of disability).

After examining plaintiff, Dr. Kralik opined that plaintiff's inability to work was related to her desire to stay at home with her daughter, rather than a true inability to perform work-related activities. She also indicated that, with treatment, plaintiff had a very good prognosis. Given these facts, we find substantial evidence to support the ALJ's determination that plaintiff can perform work at all exertional levels, limited only by her need for work where the interpersonal contact required is incidental to the work performed; the complexity of the tasks

15

is learned or performed by rote with few variables; the work requires little judgment; and, the supervision required is simple, direct and concrete.

We also find substantial evidence to support the ALJ's finding that plaintiff could still perform work that exists in significant numbers in the national economy. The VE testified that a hypothetical person of plaintiff's age, education, and work history, with an unlimited physical capacity and mental limitations resulting in the need for work where the interpersonal contact required is merely incidental to the work performed; the complexity of the tasks is learned or performed by rote with few variables; the work requires little judgment; and, the supervision required is simple, direct and concrete, could perform work as a production line assembler (light work) and poultry deboner (light work). (Tr. 280). *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). It is clear that these positions require only incidental contact with others. *See* DICTIONARY OF OCCUPATIONAL TITLES §§ 369.687-010, 525.687-066, *at* www.westlaw.com. Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff can perform these jobs.

Plaintiff contends that the ALJ erred by failing to fully and fairly develop the record. Specifically, she alleges that the ALJ erred in failing to accord controlling weight to Dr. Thomason's opinion that plaintiff was in need of further psychiatric evaluation. (Tr. 258). We note, however, that Dr. Thomason's report was not before the ALJ, as his assessment was conducted in November 2006, after the ALJ had rendered his decision. Accordingly, the plaintiff can only argue that the Appeals Council erred in failing to remand the case to the ALJ based on Dr. Thomason's report. We do not find this argument to be compelling, because this assessment is not supported by the remainder of the evidence of record. As previously stated, however, the

16

record reveals that plaintiff did not seek out mental health treatment during the relevant time period. Aside from plaintiff's prenatal and postnatal appointments, it also appears as though she was only treated for her depression once every three months. It also appears as though the medications prescribed were somewhat helpful in alleviating some of plaintiff's symptoms. Accordingly we do not believe that Dr. Thomason's assessment would have impacted the ALJ's decision. Therefore, we find substantial evidence to support the ALJ's decision.

**Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 29th day of April 2008.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)